# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
# JACKSON DIVISION

PEARLEAN WOLFE, INDIVIDUALLY AND
AS ADMINISTRATRIX OF THE ESTATE OF
CHARLIE WALKER, DECEASED                              **PLAINTIFF**

v.                                   CIVIL ACTION NO. 3:06-cv-412HTW-LRA

UNITED STATES OF AMERICA AND
JOHN AND JANE DOE 1-5                                 **DEFENDANT**

## FINDINGS OF FACTS AND CONCLUSION OF LAW

Before this court is the Complaint filed by plaintiff Pearlean Wolfe, Individually and as Administratrix of the Estate of Charlie Walker, Deceased, against the sole defendant, the United States of America. Plaintiff Wolfe also names as defendants "John and Jane Doe 1-5." Since these John/Jane Does have never been identified by plaintiff, the court dismisses them from this action. Plaintiff's complaint alleges negligence against the Jackson Veterans Affairs Medical Center (JVAMC) which is an agency of the United States of America. Plaintiff alleges that the emergency staff of the JVAMC failed to diagnose and treat Charlie Walker when he presented to the JVAMC following a one-car accident on August 24, 2002, and that this failure to diagnose and treat Walker led to his demise on September 3, 2002. While plaintiff's complaint focused on JVAMC's diagnosis and treatment of Walker's pneumothorax, her proof at trial was broader, having attacked the failure of JVAMC to admit Walker on August 24, 2002; JVAMC's next day review of Walker's portable x-ray; and JVAMC's timing for insertion of a chest tube.

Assured that this court has subject matter jurisdiction pursuant to Title 28 U.S.C.

§ 2671,[1] *et seq.*, and Title 28 U.S.C. §§ 1331[2] and 1346,[3] this court conducted a bench trial on the issues herein on September 2-5, 2008. Now, pursuant to Rule 52 of Federal Rules of Civil Procedure,[4] this court announces its findings of fact and conclusions of law.

## Facts

The deceased, Charlie Walker, an African American male, was born May 11, 1923, and died on September 3, 2002, at the age of 79. Walker grew up in Bolton, Hinds County, Mississippi, and completed the 10th grade. He served in the United

---

[1] Title 28 U.S.C. § 2671 provides in pertinent part that: "[t]he term 'Federal agency' includes the executive departments, the judicial and legislative branches, the military departments, independent establishments of the United States, and corporations primarily acting as instrumentalities or agencies of the United States, but does not include any contractor with the United States."

[2] Title 28 U.S.C. § 1331 provides: "The district courts shall have original jurisdiction of all civil cases arising under the Constitution, laws, or treaties of the United States."

[3] Title 28 U.S.C. § 1346 provides in pertinent part: "the district courts, together with the United States District Court for the District of the Canal Zone and the District Court of the Virgin Islands, shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."

[4] Rule 52 states in pertinent part:

(a) Findings and Conclusions.
   (1) In General. In an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately. The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court. Judgment must be entered under Rule 58.

States Navy as a chef during World War II. After his military service, he entered the work force as a truck driver for area companies, the last of which was Mississippi Materials Company in Jackson, Mississippi. In 1985, at the age of 62, he retired from the workforce. Thereafter, his income consisted of benefits from the Social Security Administration and the Veterans' Administration.

On Saturday, August 24, 2002, Walker had a one-car accident when he struck a fence after experiencing a "black out." He allegedly suffered injury to his chest when his chest struck the steering wheel. Still able to drive, he piloted his car to the home of his brother, J.C. Williams, who lived near the scene of the accident. J.C. Williams, at Walker's request, telephoned plaintiff Wolfe to come to Williams' house so that she [plaintiff] could take her father to the JVAMC. Walker complained of pain in his chest.

Walker had blacked out before, in 2000. After that black out, he was diagnosed with a thoracic and abdominal aortic aneurysm (AAA) in October of 2000. He refused both evaluation and treatment. Walker also had a previous history of emphysema, chronic obstructive pulmonary disease, and coronary artery disease. Additionally, he had an 80 pack per year admitted history of smoking.

Following the August 24, 2002, accident, Walker presented to the G.V. "Sonny" Montgomery VA Medical Center in Jackson, Mississippi (JVAMC), with complaints that the center of his chest felt sore since his accident an hour earlier. His triage nurse was Bonnie R. Kilpatrick, R.N., and his resident physician was John M. Trotter, M.D. Physical examinations and tests were conducted, including a chest x-ray. His temperature was 95.8; pulse 98; respiratory rate 22; and blood pressure 153/91. The chest x-ray revealed the presence of an aneurysm from a previous hospital visit. Dr.

John Trotter recommended additional work up for Walker's black out spells. Those tests, including a cardiac catheterization and/or stress test, would have required admission to the hospital.

Walker twice refused admission to the hospital and any further evaluation of his physical condition. Dr. Trotter directed Walker not to drive and he discussed with him the risks presented by the aneurysm and of not having additional testing performed. Walker's daughter, plaintiff Pearlean Wolfe, was present during the conversation. Dr. Trotter emphasized to Walker and his daughter that there could be a "potential disastrous outcome" if he was not admitted for additional testing and treatment. Following his refusal to stay, Walker was then discharged home. The time was 4:43 p.m.

Because of her work schedule and ailing husband, Wolfe took her father to the home of his sister, Roseline Mason, following his discharge. Walker spent Saturday and Sunday night at his sister's home.

On Monday, August 26, 2002, a radiologist at JVAMC reviewed the portable x-ray that had been taken of Walker on Saturday, August 24, 2002, and saw that the x-ray evidenced a large pneumothorax[5] of the left lung. Immediate attempts to contact Walker were made by the JVAMC staff who also contacted the Jackson Police Department (JPD) on August 26, 2002, at approximately 1:00 p.m to seek Walker's immediate return to the JVAMC. When located, Walker initially declined to return with

---

[5]A pneumothorax is a collection of air or gas in the pleural cavity. The collection of air or gas may lead to an increase of pressure in the pleural space with the collapse of the lung. The gas enters as the result of a perforation through the chest wall or the pleura covering the lung. This perforation may be the result of a traumatic injury.

the JPD officer to the JVAMC, but later that evening, at the urging of his daughter, he agreed to return to the JVAMC and arrived at the Admission Office at approximately 6:57 p.m.

Walker was admitted on August 26, 2002. His primary attending staff physician would be Dr. Giorgio Aru, a cardiothoracic surgeon. A repeat chest x-ray and CT thorax were performed that confirmed the need for a chest tube insertion.

Dr. Tracy Evans, a cardiothoracic fellow, inserted a #32 chest tube into Walker's left chest and admitted Walker to the Surgical Intensive Care Unit (SICU). Walker developed hypoxemia and an air leak after the placement of the chest tube. On August 27, 2002, Walker became more hypoxemic and had difficulty breathing due to the placement of the chest tube.

Significantly, upon Walker's admission to the JVAMC on August 26, 2002, his lab tests, vital signs and radiological studies reflected no significant change in his condition from August 24, 2002. No evidence of any infectious process was discerned, as his white blood count remained within normal range and his partial pressure of oxygen in his blood (P02), as well as his saturation level of oxygen in his hemoglobin (SaO2) improved with the administration of oxygen. He subsequently developed complications, progressive respiratory distress, beginning on August 28, 2002. On August 28, 2002, Walker developed progressive respiratory distress. Intubation was attempted but unsuccessful. An emergency intubation, a cricothyroidotomy, was placed. Walker developed a pneumothorax on the right side during the attempted intubation. A second chest tube was placed on the right side for the pneumothorax and air leak. On August 29, 2002, Walker had air leaks bilaterally. He was seen by a

nephrologist for his renal function, and he remained on the ventilator. On August 30, 2002, the cricothyroidotomy was converted to a tracheotomy. From August 31 through September 1, 2002, Walker continued to experience difficulty in oxygenation and pain. Walker was thought to be septic and antibiotics were begun.

Walker maintained heart rate and blood pressure until 10:00 p.m. on September 3, 2002, at which time he developed sudden bradycardia (low heart rate) and hypotension despite all efforts to maintain his heart rate and blood pressure. He subsequently experienced various heart arrythmias with eventual heart stoppage at 10:30 p.m. on September 3, 2002. After experiencing intense, but failed resuscitation measures, he was pronounced dead at 10:40 p.m.

The family refused an autopsy to determine the exact cause of death. On September 6, 2002, Dr. Giorgio ARU, the certifier on Walker's death certificate, stated the immediate cause of death as cardiopulmonary arrest due to, or as a consequence of, respiratory failure.

On July 22, 2003, plaintiff served a notice of claim by certified mail upon the JVAMC. On July 24, 2006, after all of the administrative proceedings had been exhausted, plaintiff filed a wrongful death action against the JVAMC.

## Conclusions of Law

In actions brought against the United States under the Federal Tort Claims Act (FTCA), the law to be applied by the court is the law of the place where the alleged negligence occurred. *Richards v. United States*, 369 U.S. 1 (1962). Consequently, in this case Mississippi substantive law applies because the alleged negligence occurred in Jackson (Hinds County), Mississippi.

The plaintiff relies on a negligence theory to recover. Under Mississippi law, the burden is upon the plaintiff to prove by a preponderance of the evidence that the conduct of which he/she complains was negligent in character, that it was violative of some duty which the United States owed him/her, and that such breach of duty or negligence was the proximate cause of the injury or loss complained of by the plaintiff. *Palmer v. Biloxi Regional Medical Center, Inc.*, 564 So.2d 1346, 1354 (Miss. 1990). *See Phillips v. Hull*, 516 So.2d 488, 491 (Miss. 1987); *DeLaughter v. Womack*, 164 So.2d 762 (Miss. 1964). This general rule applies in medical malpractice cases. *DeLaughter v. Womack*, 164 So.2d 762 (Miss. 1964); *Hawkins v. Ozborn*, 383 F.Supp. 1389 (N.D. Miss. 1974).

As to duty, Mississippi substantive law provides as follows:

> Given the circumstances of each patient, each physician has a duty to use his or her knowledge and therewith treat through maximum reasonable medical recovery, each patient with such reasonable diligence, patience, skill, competence, and prudence as are practiced by minimally competent physicians in the same specialty or general field of practice throughout the United States, who have available to them the same general facilities, services, equipment, and options.

*Starcher v. Byrne*, 687 So.2d 737, 740 (Miss. 1997). *See also, Drummond v. Buckley*, 627 So.2d 264, 268 (Miss. 1993); *Palmer v. Biloxi Regional Medical Center, Inc.*, 564 So.2d at 1354; *Hall v. Hilbun*, 466 So.2d 856, 873 (Miss. 1985). A breach of this duty will not be presumed but rather it is presumed that a physician used ordinary care in each case. *DeLaughter v. Womack*, 164 So.2d at 769. Under Mississippi law, negligence on the part of a physician is not to be presumed because of untoward results, and negligence cannot be established in a medical malpractice case in the absence of medical testimony that the defendant failed in some particular respect to

use the requisite degree of skill and care, unless the matter in issue is within the common knowledge of the layman. *Hawkins v. Ozborn*, 383 F.Supp. at 1395.

The "negligence of a physician may only be established by expert medical testimony." *Palmer v. Anderson Infirmary Benevolent Association*, 656 So.2d 790, 795 (Miss. 1995). *See also, Travis v. Stewart*, 680 So.2d 214, 218 (Miss. 1996); *Palmer v. Biloxi Regional Medical Center, Inc.,* 564 So.2d at 1355; *Phillips v. Hull*, 516 So.2d at 491. That is, in a medical malpractice case, a plaintiff must, *through expert testimony*, establish the applicable standard of care and a breach of that standard. *Hawkins v. Ozborn*, 383 F.Supp. at 1389; *Kilpatrick v. Mississippi Baptist Medical Center*, 461 So.2d 765 (Miss. 1984); *Dazet v. Bass*, 254 So.2d 183 (Miss. 1971). *See also, Cunningham v. Mitchell*, 549 So.2d 955, 959 (Miss. 1989). The Mississippi Supreme Court has described this burden of proof as follows:

> To present a prima facie case of medical malpractice, a plaintiff, (1) after establishing the doctor-patient relationship and its attendant duty, is generally required to present expert testimony (2) identifying and articulating the requisite standard of care and (3) establishing that the defendant physician failed to conform to the standard of care. ... In addition, (4) the plaintiff must prove the physician's noncompliance with the standard of care caused the plaintiff's injury, as well as proving (5) the extent of plaintiff's damages.

*Robinson v. Hawkins*, 541 So.2d 1048, 1050-1051 (Miss. 1989) (quoting *Ladner v. Campbell*, 515 So.2d 882, 887-888 (Miss. 1987)). *See also*, *Hubbard v. Wansley,* 954 So.2d 951 (Miss. 2007).

### **The Evidence**

During the course of trial, the court heard from five witnesses called by the

plaintiff: Katheryn Chambliss; Dr. Giorgio Aru; Dr. Katrina Babcock (plaintiff's expert physician, a psychiatrist, by deposition); Pearlean Wolfe; and Dr. Glenda Glover (plaintiff's expert economist).

The court received into evidence the following exhibits offered by plaintiff: P-1 JVAMC medical records; P-2 Curriculum Vitae, Dr. Katrina Babcock; P-3 Affidavit, Dr. Katrina Babcock; P-4 Forms SSA-1099 for 2001 and 2002; P-5 Curriculum Vitae, Dr. Glenda Glover; P-6 Economic Analysis, Dr. Glenda Glover; P-7 Death Certificate; P-8 Reference Slip; P-9 Photo of Charlie Walker.

Dr. Katrina Babcock's deposition was received into evidence as the court's exhibit C-1. Dr. Babcock testified that she is familiar with the standard of care in 2002, for emergency room medicine in the treatment of a pneumothorax. Dr. Babcock testified that because Walker had underlying problems such as hypertension and aneurysm, as well as an already compromised respiratory system due to a smoking history and chronic obstructive pulmonary disease, Walker should have been treated immediately on August 24, 2002, with the placement of the chest tube. Dr. Babcock testified the delay in the placement of the chest tube was a deviation and departure from the accepted emergency room practice and that this deviation and departure caused or contributed to Walker's death.

Dr. Aru, Dr. Trotter and the defendant's expert witness, Dr. Maria Rappai, a pulmonologist, all opined that the two-day delay in the placement of the chest tube for the pneumothorax did not cause Walker's death. These doctors attribute Walker's death to multiple medical problems and the development of pneumonia while he was in the hospital.

The defense offered the following exhibits: D-1 JVAMC Medical Records of Charlie Walker; D-2 JVAMC Chest X-rays of Charlie Walker dated August 24 and 26, 2002, respectively; D-3 Jackson Police Department Report dated August 26, 2002; D-4 Expert Report of Dr. Maria Rappai; D-5 Expert Report of Dr. Carl Brooking; D-6 Life Expectancy/Work Life Expectancy Tables: <u>2002 Future Damage Calculator</u> published by Lawyers and Judges Publishing Company; D-7 Dr. John McLean Trotter's CV.

## **Holding**

This court concludes that the plaintiff has failed to meet her burden of proving by a preponderance of the evidence that defendant JVAMC breached the requisite standard of care and that this breach caused Walker's death. Several reasons undergird the court's reasoning.

First, Walker postponed his own medical care. He initially refused treatment on August 24, 2002, and reluctantly, after much coaxing, agreed to treatment on August 26, 2002. Even plaintiff's expert, Dr. Babcock, had to acknowledge these facts and recognize that a patient has the right to refuse tests and treatment. That Walker was there at the hospital on August 26, 2002, at all, was due primarily to the insistence of JVAMC. In the absence of that insistence, Walker would have died elsewhere. Thus, this court finds no fault with JVAMC on August 24, 2002, for failing to detain Walker and treat him against his will.

Next, this court is not persuaded that JVAMC, in its valiant effort to save the life of a non-cooperative patient, violated the requisite standard of care in striving to save his life. This court is not convinced that JVAMC's reading of the portable x-ray the following day subjects it to any liability. Plaintiff has adduced no credible evidence

showing this to constitute negligence. Nor has plaintiff demonstrated by a preponderance of the evidence that JVAMC's decision to insert and method of inserting a chest tube amounted to a breach of the standard of care.

Plaintiff's case also suffers under an analysis of legal, causal connection. Under Mississippi law, in order to establish a "legal" causal connection, the plaintiff must show that the claimed proper treatment (in this case the earlier admission of the plaintiff to the JVAMC) would have provided him with a **greater** than fifty percent chance of a better result than was in fact obtained. *See Ladner v. Campbell*, 515 So.2d 882, 889 (Miss. 1987) ("[s]ome courts have held that the plaintiff has to supply evidence that proper treatment would have provided the patient 'with a greater than fifty (50) percent chance of a better result than was in fact obtained.' 54 A.L.R. 4th 10 § 2[a]. The *Clayton* decision [*Clayton v. Thompson*, 475 So.2d 439 (Miss. 1985)] clearly placed the Mississippi rule in alignment with traditionally conservative jurisdictions, and rejected the notion that a mere 'better result absent malpractice' would meet the requirements of causal connection.").

Plaintiff's expert, Dr. Babcock, failed to provide any testimony that an earlier admission of Walker to the JVAMC would have provided Walker with a greater than fifty percent chance of a better result than was in fact obtained. Plaintiff says that notwithstanding a lack of such testimony from her expert, she has established such under the layman exception. *See Drummond v. Buckley*, 627 So.2d 264, 268. This court disagrees.

Finally, still on the topic of causation, this court notes that Walker had numerous complications, including infection, sepsis, acute renal failure, and arrythmias. This

court is not persuaded that plaintiff's proof ruled out these complications as contributing to and/or causing the death of Walker.

## Conclusion

Plaintiff has the burden of proof. She has not shouldered it. Accordingly, in light of the above factual findings and legal conclusions, the court concludes that the plaintiff should take nothing, that the Complaint and claims of medical malpractice should be dismissed with prejudice, and that judgment should be entered in favor of the United States awarding it its costs. A final judgment in accordance with these findings of fact and conclusions of law shall issue.

**SO ORDERED AND ADJUDGED, this the 31st day of March, 2010.**

**S/HENRY T. WINGATE**

_____
**CHIEF JUDGE
UNITED STATES DISTRICT COURT**

Civil Action No. 3:06-cv-412 HTW-LRA
Findings of Fact and Conclusion of Law